SCHOOL DISTRICT FOR the CITY OF ROYAL OAK, Plaintiff–Appellee,

v.

CONTINENTAL CASUALTY COMPANY, Defendant–Appellant.

No. 89–2127.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1990.

Decided Aug. 22, 1990.

Philip J. Goodman, argued, Steven G. Silverman, Southfield, Mich., for plaintiff-appellee.

Roy H. Christiansen, Kerr, Russell & Weber, Detroit, Thomas H. Crouch, William M. Hart, Bradley M. Jones, Christian A. Preus, argued, Meagher, Geer, Markham, Anderson, Adamson & Flaskamp, Minneapolis, Minn., for defendant-appellant.

Before MILBURN and NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

The main question presented in this appeal is whether, under Michigan law, public policy bars enforcement of a liability insurance policy covering an allegedly intentional civil rights violation. The district court held that Michigan law did not preclude enforcement of the insurance policy in accordance with its terms. The court also held that although the civil rights violation constituted an employment contract violation as well, the insurer could not disclaim coverage on the basis of a policy exclusion for contractual obligations. Summary judgment was entered against the insurer for the full amount of the costs incurred by the insured in the defense and settlement of the civil rights action.

We agree with the district court's resolution of the coverage question. We shall remand the case, however, because of the existence of a factual issue as to the reasonableness of the settlement reached by the insured in the civil rights case.

I

The insured party, the School District for the City of Royal Oak, Michigan, was sued by a kindergarten teacher over a denial of tenure. The teacher alleged in her complaint that she is a Roman Catholic; that she let her principal (a Jewish woman) know of her "high regard for Catholic institutions and Catholic education;" that the principal developed an intense animosity toward the teacher because of the latter's religious beliefs and because of her expressions of support for labor unions; that the principal improperly recommended that the teacher be denied tenure; and that despite strong support for the teacher from parents and other teachers, tenure was denied on the basis of the principal's recommendation. The teacher sought to recover damages from the school district and the principal under 42 U.S.C. § 1983, asserting a denial of federal constitutional rights. The teacher also claimed that both defendants had violated Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et seq.*, and that the principal had tortiously interfered with an advantageous business relationship.

The teacher's case went to trial before a jury in the United States District Court for the Eastern District of Michigan. The jury found that the school district was liable both on religious discrimination grounds and for interference with the teacher's constitutional right of free speech. The principal was found liable on the tortious interference claim only.

The jury assessed damages against the school district in a total amount of $500,000, half of which was for lost wages and half for emotional distress. Punitive damages of $5,000 were assessed against the principal. The district court struck the award of punitive damages, but judgment was entered on the full amount of the verdict against the school district.

The school district rejected a post-trial settlement proposal under which the teacher would have received $60,000 and reinstatement with tenure. Reinstatement was unacceptable, according to the school district, because the plaintiff "was deemed to be an unsatisfactory teacher." While the case was pending on appeal, the school district agreed to a $250,000 settlement with no reinstatement.

■ The school district carried liability insurance under a policy written by defen-

dant Continental Casualty Company. During the course of the negotiations over settlement of the civil rights action, the school district advised Continental that the Sixth Circuit's "conference attorney" (an official whose good offices may be used to facilitate settlement of cases on appeal to this court) had "strongly suggested that the case could be settled for $250,000;" that the school district was prepared to make a settlement offer of $200,000; and that pursuant to a policy provision saying that no settlement was to be made without the insurer's consent, Continental was being given "an opportunity to express its consent, or lack thereof...." [1]

Continental responded that although it would not affirmatively consent to the proposed $200,000 settlement, it would waive its right to do so. This "waiver" did not amount to much, because after reserving various coverage defenses that had been set forth in previous correspondence, the company stated explicitly that it would "reserve the right to contest the reasonableness of the proposed settlement." (Continental made no response to a subsequent letter in which the school board gave notice that it had agreed to a settlement in the amount of $250,000.)

Shortly after the settlement was concluded, the school board sued Continental in state court to recover both the amount paid in settlement and all costs of defense. The action was removed to federal court, where cross-motions for summary judgment were filed. Rejecting a variety of defenses asserted by Continental, including one based on the argument that intentional discrimination is uninsurable under Michigan law, the court granted summary judgment to the school district for the full amount of the settlement *cum* defense costs. This appeal followed.

## II

The insuring clause of the Continental policy, as amended in 1974 by a "liberalization endorsement," provides in essence that if any claim or claims be made against the school district or its employees for a "Wrongful Act," Continental will pay for "all loss" that the school district or its employees become legally obligated to pay. The term "Wrongful Act" is defined as including any "act or omission or neglect or breach of duty by [school district employees] in the discharge of their duties...." The term "loss" is defined as including "settlements" and "defense of legal actions," provided that the subject of the loss does not include "matters which shall be deemed uninsurable under [Michigan] law...."

A "clarification endorsement" provides that the policy does not insure against loss arising, among other things, out of any failure to integrate student enrollment on the basis of race, or out of the administration of student enrollment on a racially discriminatory basis. Exclusions set forth in the body of the policy provide that Continental is not liable to pay for loss in connection with any claim against school district employees "for false arrest, libel, slander, defamation of character, invasion of privacy, wrongful eviction, assault or battery, except insofar as may be insured under any other valid policy or policies, and then only in excess of such insurance." The liberalization endorsement broadens both the insuring clause and the exclusions to cover claims against the school district itself. The endorsement also adds an exclusion *"[f]or any amounts due [ ] under the terms of any contractual obligation ...."* (Emphasis supplied.) The latter exclusion, on which Continental relies here, is set forth in paragraph IV(b)(6) of the policy.

**1.** "In telling the insurance company of the conference attorney's impression that the plaintiff would be willing to settle for $250,000, the School District was doing essentially the same thing a lawyer does in reporting to his client on settlement negotiations. The disclosure did not violate Sixth Circuit Rule 18, which deals with the confidentiality of communications with the conference attorney. Because the letter containing the disclosure was directly relevant to an issue (in a separate cause of action) before the district court, the introduction of the letter was perfectly proper."

## III

A collective bargaining agreement entered into between the school district and the teacher's union expressly obligated the school district "to uphold the civil rights of all persons who are party to this agreement" and to "continue its policy of not discriminating against any employee on the basis of race, creed, [or] religion...." The jury having found that the school district discriminated against the teacher on the basis of her religion, which the school district had contracted not to do, Continental argues that the exclusion in paragraph IV(b)(6) relieves Continental of any obligation under the policy.

Although Continental maintains that "the School District's liability for payment arose *solely* by virtue of its contractual obligations to [the teacher]" (emphasis in original), this overstates the case. It is true that there could have been no liability for an improper denial of tenure if the teacher had not been given an employment contract in the first place, but the teacher never sued for breach of contract. The claims asserted in her complaint were in no way dependent on the nondiscrimination provisions of the collective bargaining agreement. Under the teacher's theory, a denial of tenure on grounds forbidden by the Constitution would have rendered the school board liable in a § 1983 action whether or not the collective bargaining agreement said anything on the subject, just as a denial of tenure. on the basis of religion would have given rise to liability under the Elliott–Larsen Act regardless of anything in the collective bargaining agreement.

The principle that ought to govern here, it seems to us, is that an exclusion of liability insurance coverage for contractually assumed obligations to third parties is operative only where the insured would not have been liable to the third party absent the insured's agreement to pay. See Annot., 63 A.L.R.2d 1114, 1123 (1959), cited in *Lebow Assoc., Inc. v. Avemco Ins. Co.*, 439 F.Supp. 1288, 1291 (E.D.Mich.1977). We cannot improve upon what Judge Charles Joiner, a distinguished Michigan jurist and teacher of law, said in *Lebow:*

"A major rationale underlying the principle that assumed liability exclusion clauses are inoperative when the liability assumed is coextensive with the insured's liability imposed by law is that the insured's assumption of liability does not expand the insurance company's element of risk, upon which the insured's premium amounts are predicated, beyond the original contractual agreement of the parties. To allow an insurance company to avoid payment of its insured's liability to a third party, which otherwise exists by operation of law, merely because the insured contractually assumed the same liability to the third party would be to. judicially condone a unilateral alteration of the substantive terms of the contract in favor of the insurance company on grounds which are not even relevant to the element of risk which underlies each parties' (*sic*) bargaining position. Such a result would undoubtedly be contrary to the reasonable expectations of the insured." *Id.* at 1291.

We note also that state courts in both Iowa and Delaware have held that paragraph IV(b)(6) of Continental's form of policy does not have the legal effect Continental claims for it. See *Continental Casualty Co. v. Anne Arundel Community College*, 867 F.2d 800, 802–03 (4th. Cir.1989), discussing unpublished opinions in *Employers Mutual Casualty Co. v. Sioux City Community School Dist. and Continental Casualty Co.*, No. CL 19–10933 (District Ct. for Polk County, Iowa 1980), and *Indian River School District v. Continental Casualty Co.*, No. 79C–NO9 (Superior Ct. for Sussex County, Delaware 1980).

## IV

Even if the "contractual obligation" exclusion does not relieve Continental of responsibility for indemnifying the school district, Continental argues that the teacher's discrimination claim is uninsurable as against public policy. If we were to accept this argument, Continental would be entitled to judgment both because contractual

provisions that violate public policy are void (see *Federoff v. Ewing*, 386 Mich. 474, 192 N.W.2d 242 (1971); *Myers v. Western Southern Ins. Co.*, 849 F.2d 259, 260–61 (6th Cir.1988)) and because the policy itself excludes from the definition of "loss" matters deemed "uninsurable" under Michigan law.

It has been said that intentional misconduct, as opposed to negligence, is usually not insurable. See Comment, *Insurance Against Civil Liability for Employment Discrimination*, 80 Colum.L.Rev. 193, 195 (1980), and the authorities cited therein at note 23. But the drafters of the Continental policy evidently did not consider all intentional misconduct uninsurable, or they would not have excluded from coverage such volitional torts as assault and battery "except insofar as [they] may be insured under any other valid policy...." Neither would the Continental policy have provided for "excess" coverage on such torts if they had been thought uninsurable.

One widely-accepted test for insurability is whether there is likely to be a causal connection between the wrongful act and the existence of insurance coverage. "The test is not simply whether the insured acted intentionally or unintentionally, but rather whether he may have been stimulated by the prospect of indemnification." 80 Colum.L.Rev., *supra*, at 196.[2]

If the "stimulation" test is to be applied here, we think the school district's liability for the denial of tenure ought to be held insurable. The clash of personalities, cultures and values that allegedly led in this case to the principal's unfavorable tenure recommendation could easily be duplicated in almost any school district in this remarkably diverse country of ours. Perhaps the existence of liability insurance might occasionally "stimulate" such a contretemps, but common sense suggests that the prospect of escalating insurance costs and the trauma of litigation, to say nothing of the risk of uninsurable punitive damages, would normally neutralize any stimulative tendency the insurance might have.

*Pace* Professor Willborn, moreover, we do not believe that most courts would wish to encourage litigation over the question whether particular insurance policies did or did not have a stimulative effect in particular cases. The insurability of "intentional" discrimination in a given state is likely to be decided categorically, we think, rather than case-by-case.

The categorical approach was followed in *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So.2d 1005 (Fla.1989), where a divided court gave an affirmative answer to the following question:

"Does the public policy of Florida prohibit an insured from being indemnified for a loss resulting from an intentional act of religious discrimination?" *Id.* at 1005.

Citing *dicta* in *Western Casualty & Surety Co. v. Western World Ins. Co., Inc.*, 769 F.2d 381 (7th Cir.1985) (discrimination that may or may not have been intentional *held* insured under a policy covering "discrimination excluding intentional acts"), a majority of the Florida court concluded that to hold intentional religious discrimination insurable would be to encourage such discrimination.[3] Chief Justice

---

**2.** Although the author of the Columbia Law Review Comment urges that indemnification for legal expenses incurred in defending discrimination suits would be appropriate regardless of the nature of the employer's conduct, the author concludes that indemnification for payments to victims of "intentional" discrimination should be disallowed on public policy ground whether or not one believes that such discrimination is "stimulated by the prospect of indemnification." The latter conclusion is challenged—quite effectively, we believe—in Willborn, *Insurance, Public Policy, and Employment Discrimination*, 66 Minn.L.Rev. 1003 (1982). Willborn urges that public policy should preclude insurance coverage only where the employer has acted with "calculating intent," meaning that the employer has not only decided to engage in illegal discrimination, but has calculated that because of the existence of insurance coverage, the discriminatory purpose outweighs the potential cost of indulging it.

**3.** *Ranger* involved discrimination in the sale of real estate that had been burdened by a racial restrictive covenant and that could not be sold to anyone who was not a member of the Bal Harbour Club. The discrimination in *Ranger* would thus appear to have been more clear-cut than that usually found in employment cases. It might or might not have made a difference if the insurability question had arisen in the con-

Ehrlich filed a strong dissent. He did not quarrel with the majority's failure to insist on a factual inquiry as to whether the existence of insurance had stimulated the Bal Harbour Club to discriminate against Jewish people. Speaking "[a]s one who has [himself] been the target of such intentional discrimination," however, Chief Justice Ehrlich expressed the view that "it is preeminently reasonable to conclude, based on good business and common sense and everyday experience, that intentional religious discrimination will not be encouraged by the fact of insurance." 549 So.2d at 1010.

Quoting Michigan caselaw, the district court reached a comparable conclusion in the case at bar: "[I]t is unlikely that the insured was induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising therefrom or that allowing insurance coverage here would induce future similar unlawful conduct...." P. 42 of transcript of proceedings held before Patrick J. Duggan, J., on August 14, 1989 (quoting *Vigilant Insurance Co. v. Kambly*, 114 Mich.App. 683, 687, 319 N.W.2d 382, 385 (1982) (Michigan public policy did not bar insurance coverage for felonious sexual activity engaged in by a psychiatrist with his patient under the guise of treating her.)) Citing *Bowman v. Preferred Risk Ins. Co.*, 348 Mich. 531, 83 N.W.2d 434, 436 (1957), for the proposition that "Michigan does not as a general rule bar recovery under public liability policies because some illegal act was involved in the damage," Judge Duggan went on to say that he was "unaware of any Michigan law that deems intentional discrimination 'uninsurable.'" Transcript at 44.

We are not aware of any such Michigan law either—and where a question of state law is in doubt, we must accord great deference to the views of a district judge from that state on how the state's highest court would be likely to decide the question. See *Wright v. Holbrook*, 794 F.2d 1152, 1155 (6th Cir.1986). Judge Duggan pointed out,

correctly, that "[u]nlike the insuring clause that was before the Court in *Solo* [*Cup v. Federal Ins. Co.*, 619 F.2d 1178 (7th Cir.), *cert. denied*, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980)], the policy language before this Court in determining 'wrongful act' cannot be fairly construed to exclude intentional acts." *Id.* Public policy normally favors enforcement of insurance contracts according to their terms, *cf. Ranger*, 549 So.2d at 1010 n. 1 (Ehrlich, C.J., dissenting), and we have no reason to think that Michigan differs from other states in this regard. And in the absence of state legislation or a state supreme court decision holding intentional discrimination uninsurable, as Judge Duggan pointed out, "insurers can always exclude or limit coverage if done in clear language." Continental did precisely that in its rider excluding coverage for racial discrimination in student enrollment. Had the company wished to exclude coverage for intentional religious discrimination in employment, it could and should have said so.

Finally, we are strengthened in our conclusion on the coverage question by the fact that we have no way of knowing whether the school district actually did engage, on impermissible grounds, in intentional discrimination. The jury, after all, found that the principal on whose recommendation the school board acted was *not* guilty of such discrimination. If the servant was not at fault in this respect, it is far from certain that the master was. In its settlement agreement with the teacher, moreover, the school district insisted that it was not guilty of any illegal discrimination at all, much less intentional discrimination. And the settlement was reached, of course, before the appeal was decided; no one knows what the final result would have been had the case gone forward. *Cf. Western Casualty Ins. Co. v. Western World Ins. Co.*, 769 F.2d 381, 384 (7th Cir.1985), where the impossibility of knowing the basis of liability was one of the circumstances that led Judge Easterbrook and his col-

text of a lawsuit for discrimination in employment, where the unpredictability factor often looms fairly large.

leagues on the Seventh Circuit to find coverage under a policy that covered "discrimination," but expressly excluded "intentional acts."

## V

The only remaining question is whether Continental pointed to any genuine issue of material fact that would preclude entry of the summary judgment against it. Continental claims to have identified two such issues. We agree as to one and disagree as to the other.

■ The first alleged factual issue is whether the exclusion contained in paragraph IV(b)(6) of the policy was intended to apply even where a contractual obligation not to discriminate merely echoed an obligation imposed by statute or by the Constitution. Normally, questions on the meaning and effect of insurance contract provisions are questions of law, not questions of fact. *Sentry Security Systems, Inc. v. Detroit Automobile Inter–Insurance Exchange*, 56 Mich.App. 182, 223 N.W.2d 708 (1974), *rev'd on other grounds*, 394 Mich. 96, 228 N.W.2d 779 (1975) (" 'As a general rule, the construction of a written contract of insurance is a matter of law to be determined by the court....' " 223 N.W.2d at 711, quoting *Fadden v. Cambridge Mutual Fire Ins. Co.*, 51 Misc.2d 858, 274 N.Y.S.2d 235 (1966)). Extrinsic evidence of the contracting parties' actual intent may be admissible where the language of the contract is ambiguous, but if Continental had any such evidence—as it did in *Continental Casualty Co. v. Anne Arundel Community College*, 867 F.2d 800, 803 (4th Cir.1989), where there was evidence of a practical construction placed on the insurance policy by the insured itself—Continental was required to set forth the specific facts relied on. Rule 56(e), Fed.R.Civ.P. This Continental did not do.

■ The second alleged factual issue is whether the school district's $250,000 settlement was reasonable in amount. It may be recalled that Continental specifically reserved its right to contest the reasonableness of a proposed settlement for $200,000, and we have seen nothing to suggest that the company was told before-the-fact that the school district was going to agree to an amount even higher than that. It will also be recalled that the school district, rating the teacher "unsatisfactory," turned down a $60,000 settlement proposal that would have obligated it to reinstate the teacher with tenure. Whether the school district's position was actually justified is a factual question which, on this record at least, is not susceptible to determination by summary judgment.

Accordingly, the judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.