NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0040n.06

No. 13–1468

FILED

Jan 16, 2014

DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

WILLIAM BEAUMONT HOSPITAL, )
)
    Plaintiff – Appellee, )
)
        v. )
)
FEDERAL INSURANCE COMPANY, )
)
    Defendant – Appellant. )

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

OPINION

Before:  COOK and STRANCH, Circuit Judges, and CARR, District Judge.[*]

**CARR**, District Judge. This is an appeal arising from an insurance coverage dispute. The district court held that defendant/appellant Federal Insurance Company (Federal) had to provide indemnification coverage to plaintiff/appellee William Beaumont Hospital (Beaumont) for the settlement of an antitrust class action by nurses against Beaumont and other Detroit-area hospitals. Federal argues on appeal that it owes no duty to indemnify Beaumont under the terms of its insurance policy (the Policy).  Alternatively, Federal argues Michigan's public policy bars any indemnification obligation that might arise under the Policy.

For the reasons that follow, we find that Federal is required to provide coverage under the explicit terms of its Policy and that Michigan's public policy does not bar coverage.  We, therefore, AFFIRM the district court's order and opinion.

---

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

## I. Factual and Procedural Background

### A. The Insurance Policy

On July 31, 2007, Federal issued an insurance policy to Beaumont. Generally, the Policy provides coverage to Beaumont for:

> [A]ll **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured** during the **Policy Period** . . . for a **Wrongful Act** committed, attempted, or allegedly committed or attempted, by an **Insured** before or during the **Policy Period**.[1]

R. 11-2 PAGE ID 188.

The Policy expressly provides coverage for antitrust claims under Endorsement No. 10:

> [Federal] shall pay on behalf of the **Insured** the **Covered Percentage** . . . of **Loss**, including **Defense Expenses**, from each **Antitrust Claim** first made against an **Insured** during the **Policy Period**.

*Id.* at 208.

Under this endorsement, "covered percentage" is defined as eighty percent. *Id.* The maximum amount of coverage Federal provides is $25 million. *Id.* "Antitrust Activity" is defined as:

> any actual or alleged . . . price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act, or any other federal statue [sic] involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statues [sic], or of any similar provision of any federal, state or local statute, rule or regulation or common law.

*Id.* at 209.

Both parties agree that the nurses' action is an Antitrust Claim. The parties dispute the meaning of Loss. The Policy generally defines that term as:

---

[1] The Policy defines bolded terms elsewhere in the document.

[T]he total amount which any **Insured** becomes legally obligated to pay on account of each **Claim** and for all **Claims** in each **Policy Period** . . . made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and **Defense Costs**.

*Id.* at 194.

Endorsement No. 31 amended the definition of Loss to include "the multiple portion of any multiplied damage award." *Id.* at 245. It also provides:

Solely with respect to any **Claim** based upon, arising from or in consequence of profit, remuneration or advantage to which an **Insured** was not legally entitled, the term **Loss** . . . shall not include disgorgement by any **Insured** or any amount reimbursed by any **Insured Person**.

*Id.*

## B. The Underlying Lawsuit

During the Policy term, two registered nurses, neither of whom Beaumont employed, instituted a class action against eight Detroit-area hospital systems including Beaumont. *Cason-Merenda v. Detroit Med. Ctr., et al.*, Case No. 06-15601 (E.D. Mich.) (the Action or the Underlying Lawsuit). The nurses claimed the hospitals had violated § 1 of the Sherman Act, 15 U.S.C. § 1, by 1) conspiring to depress wages of the nurses and 2) exchanging information regarding the compensation of nurses, which had the effect of depressing their wages.

On behalf of themselves and the class, the named plaintiffs sought "to recover for the compensation properly earned by [registered nurses] employed at Detroit-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein." R. 1-3 PAGE ID 87. They further demanded recovery of "their damages against each defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a)." *Id.* at 100. In total, the nurses sought approximately $1.8 billion in damages.

The district court granted summary judgment in favor of the hospitals on the nurses' claim of a *per se* violation of § 1 of the Sherman Act arising from the defendants' alleged conspiracy to depress nurse compensation levels. *Cason-Merenda*, 862 F. Supp. 2d 603, 641 (E.D. Mich. 2012). The court, however, permitted the nurses to move forward on their § 1 "rule of reason" claim that the defendant hospitals had unlawfully agreed among themselves to share compensation information in a manner that harmed competition and depressed the nurses' wages. *Id*. at 647-49.

### C. Beaumont's Claim for Policy Coverage

Once named a defendant in the Underlying Lawsuit, Beaumont timely requested coverage under the Policy for the Action. Federal recognized the Action as an Antitrust Claim as defined by the Policy, which provides that Federal will pay eighty percent of otherwise covered antitrust loss. Federal then consented to Beaumont's choice of defense counsel and agreed, subject to a reservation of its right to seek reimbursement of its payment, to advance Beaumont eighty percent of its defense costs (which came to total about $3.4 million). Federal also participated in settlement discussions for the Underlying Lawsuit.

During settlement discussions with the nurses, Beaumont sued Federal, seeking a declaration from the district court that Federal was obligated to indemnify the hospital. Federal counterclaimed, arguing that the settlement constituted disgorgement and was not considered a Loss under the Policy and thus was uninsurable. While the coverage action was pending, Beaumont settled with the nurses for approximately $11.3 million. Subject to a reservation of its right to reimbursement, Federal paid Beaumont eighty percent of the settlement, or approximately $9 million. That is the amount presently at issue in this appeal.

The settlement agreement defined "Defendant" as "any person or entity named as a defendant in the Complaint," and the "Settlement Class" as:

[A]ll Registered Nurses who provided direct patient care in short term acute care facilities during the Class Period, exclusive of Registered Nurses who worked solely as supervisory, managerial or advance practice nurses, and who were employed by Defendants within the Detroit MSA at any time during the Class Period who do not timely and validly elect to be excluded from the Settlement Class.

R. 32-2 PAGE ID 1246, 1248.

Beaumont then filed motions for judgment on the pleadings and to stay discovery. R. 33, 34. Federal countered with a motion to compel discovery. R. 42. On March 13, 2013, the district court granted Beaumont's motion for judgment on the pleadings, dismissing Federal's counterclaim, Beaumont's motion to stay discovery, and Federal's motion to compel discovery. R. 46.

## II. Standard of Review

This Court reviews the district court's decision *de novo*. *Coyer v. HSBC Mortg. Servs., Inc.*, 701 F.3d 1104, 1107 (6th Cir. 2012) (per curiam) (citing *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008)).

This Court accepts as true all well-pleaded material allegations of the pleadings of the opposing party, and may grant the motion only if the moving party is nevertheless clearly entitled to judgment. *Id*. at 1107-08 (citing *Tucker v. Middleburg–Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008)). "A motion brought pursuant to Rule 12(c) is appropriately granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id*. at 1108 (quoting *Tucker*, 539 F.3d at 549).

## III. Discussion

### 1. Federal's Policy Provides Coverage Under Its Own Terms

Federal's principal argument is that the nurses' claims arose from Beaumont's gaining of profit, remuneration, or advantage to which it was not entitled and the settlement was a disgorgement of that advantage. Federal argues that the advantage gained was nursing services at

below-market compensation and that settlement is clearly disgorgement of the value of that advantage. Consequently, according to Federal, under the Policy, which expressly declines coverage of amounts constituting disgorgement, there is no coverage for what Beaumont's nurses receive from the Underlying Lawsuit.

Citing *Allstate Ins. Co. v. Freeman*, 443 N.W.2d 734, 737 (Mich. 1989), Federal argues that, though the nurses did not use the terms "disgorgement" or "restitution" in their demand for relief, the district court erred by not focusing on the real nature of their alleged injury. In this case, Federal contends, the nurses demanded that Beaumont return something it unlawfully had kept. This, in Federal's view is, plain and simple, nothing more than a demand for disgorgement.[2]

Federal points to several cases which have noted that coverage may not exist if payment represents the return of something to which the insured was not entitled, even where the underlying plaintiffs specifically requested damages. Federal heavily relies on *Level 3 Commc'ns, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001), which held that relief labeled as damages was "restitutionary in character" and thus uninsurable. Federal also cites *Conseco v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2002 WL 31961447, *10 (Ind. Cir. Ct. Dec. 31, 2002), for the proposition that even though an underlying action seeks compensatory damages, there is still a possibility of ill-gotten gains. Federal also argues that under *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 620 (W.D. Pa. 2000), *aff'd*, 345 F.3d 190 (3d Cir. 2003), the presence of treble damages in an antitrust statute indicates that the purpose of the statute is not merely to compensate victims but also to deter

---

[2] Federal does not argue that this court should look at the clause "any amount reimbursed by any **Insured Person**" (R. 11-2 PAGE ID 244) in making its decision. As the district court correctly held, under the terms of the Policy, an insured person encompasses only individuals, not companies. R. 46 PAGE ID 2327 n.9.

wrongful conduct. In other words, a demand for treble damages indicates that any award under the statute is actually disgorgement of ill-gotten gains.

Beaumont argues that under the terms of the Policy itself, Federal must cover the settlement with its own nurses as well as with nurses at other hospitals. It notes that, under *English v. Blue Cross Blue Shield of Michigan*, 688 N.W.2d 523, 537 (Mich. Ct. App. 2004), courts "must enforce clear and specific exclusions and will construe them strictly in favor of the insured." Beaumont contends that disgorgement and restitution are distinct remedies and that the Policy only explicitly excludes disgorgement. It argues that, based on their complaint, the nurses were seeking only compensatory damages.

Citing *Chubb Custom Ins. Co. v. Grange Mutual Casualty Co.*, 2011 WL 4543896, *11 (S.D. Ohio Sept. 29, 2011), Beaumont argues that money unlawfully *retained* is not the same in its legal character as money wrongfully *acquired*. Moreover, money paid to resolve a legal dispute is not necessarily a return of something to which the payor was not legally entitled in the first place.

We find Beaumont's argument convincing. First, the exclusionary clause itself specifically states that only disgorgement is not a covered loss. The endorsement also explicitly covers treble damages as an insurable loss. Federal's arguments, which use the terms disgorgement and restitution interchangeably, even though the Policy speaks only in terms of disgorgement, are unpersuasive. Federal wrote the Policy using the term disgorgement without mentioning reimbursement; a court construes policies strictly in favor of the insured. *English*, 688 N.W.2d at 537. Moreover, Beaumont points out, Federal used the term restitution elsewhere in the Policy, so it should be aware of the difference between the two terms. R. 11-2 PAGE ID 235 (Endorsement No. 27 provides coverage for regulatory claims excluding "any amount of overpayment or *restitution*

that is identified as such in any document or instrument effecting any settlement.") (Emphasis supplied).

The words of Endorsement No. 31 resolve this issue. Disgorgement and compensatory damages are closely related but not interchangeable. Black's Law Dictionary (9th ed. 2009) defines disgorgement as "[t]he act of giving up something (such as profits illegally *obtained*) on demand or by legal compulsion." (Emphasis supplied.) The same source defines actual damages as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses. — Also termed compensatory damages."

According to Webster's Third New International Dictionary (1993), disgorge means "to give up illicit or ill-gotten *gains*." (Emphasis supplied). Illicit means "not permitted, not allowed, unlawful." Ill-gotten means "*obtains* dishonestly or otherwise unlawfully or unjustly." (Emphasis supplied). Gain[] means "an increase in or addition to what is of profit, advantage, or benefit . . . resources or advantage *acquired* or increased." (Emphasis supplied). Finally, obtain means "to *gain or attain possession* or disposal of usually by some planned action or method." (Emphasis supplied).

Relying on the definitions of these terms, we find the hospital never gained possession of (or obtained or acquired) the nurses' wages illicitly, unlawfully, or unjustly. Rather, according to the nurses' complaint, Beaumont *retained* the due, but unpaid, wages unlawfully. This is not mere semantics. Retaining or withholding differs from obtaining or acquiring. The hospital could not have taken money from the nurses because it was never in their hands in the first place. While the hospital's alleged actions are still illicit, there is no way for the hospital to give up its ill-gotten gains if they were never obtained from the nurses. Therefore, the damages Beaumont paid in settlement of the claim does not constitute disgorgement.

Beaumont persuasively notes that *Level 3* and its progeny all involve wrongfully acquiring something—such as stealing from pension funds, securities fraud, or unlawfully levied taxes. *See, e.g.*, *Level 3*, 272 F.3d at 910 (insured had "obtained the plaintiffs' company by false pretenses"); *In re TransTexas Gas Corp.*, 597 F.3d 298, 310 (5th Cir. 2010) (return of funds due to a fraudulent transfer was not insurable); *CNL Hotels & Resorts, Inc. v. Twin City Fire Ins.Co.*, 291 F. App'x 220, 223 (11th Cir. 2008) (per curiam) (insured acquired money in violation of law so the return of the money was not a covered loss). Thus, the actors in these cases were subject to disgorgement because they retained funds unlawfully.[3]

In *Chubb*, the court specifically articulated the distinction between retaining and acquiring. 2011 WL 4543896, at *11. In that case, an insured carrier used computer software to process insurance claims so that the insurers under-adjusted claims. *Id.* at *1. Chubb argued that the amount retained was disgorgement and the insured benefitted because of what it retained by making lower payments on claims. The court held that even though plaintiffs requested restitutionary relief, the substance of the claim was damages because defendant did not "wrongfully acquire" money but "simply retained it." *Id.* at *11.

In addition to the explicit terms of the Policy, the calculation of the settlement itself indicates that the nurses were seeking purely compensatory damages. As the district court noted, the damages expert for the nurses computed injury to the class by calculating the difference between the actual

---

[3] Other courts have distinguished *Level 3* on this ground. *See Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62,70 (1st Cir. 2010) (holding that defendant "obtained no identifiable asset" and "therefore the [underlying] settlement payment cannot represent the restoration to the plaintiffs of some amount [the defendant] had improperly taken and withheld"); *Virginia Mason Med. Ctr. v. Exec. Risk Indem., Inc.*, 2007 WL 3473683, *3 (W.D. Wash. Nov. 14, 2007) (holding that the underlying suit "did not seek to prevent unjust enrichment or to deprive [defendant] of the 'net benefit' of its allegedly wrongful act" but rather the underlying settlement "was calculated by determining the individual harm suffered by each plaintiff"), *aff'd*, 331 F. App'x 473 (9th Cir. 2009).

earnings of the class members during the class period and the earnings the hospital would have paid its nurses but for its alleged anti-competitive misconduct. This is a classic compensatory damages calculation—it attempts to put the nurses in the position they would have been if not for the violation. No part of the calculation was based on the hospital's profits (whether actual or estimated) resulting from its misconduct.

Moreover, a formula (approximately two percent of the total wages Beaumont paid the nurses during the class period) was the basis for calculating the settlement amount. R. 746 PAGE ID 36615. Again, as the district court noted, this settlement formula bears no relationship to Beaumont's profits; rather the nurses' compensation provides the method of determining what Beaumont must pay in settlement of the case. Thus, this settlement does not represent disgorgement but a rather straightforward calculation of the nurses' compensatory damages.

Finally, the body of antitrust law itself tends to go against Federal's arguments that the settlement constituted disgorgement. The Supreme Court has emphasized that "the antitrust private action was created primarily as a remedy for the victims of antitrust violations." *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 575 (1982). Other circuits have recognized the compensatory nature of the private antitrust action. *See, e.g.*, *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir. 1972) (proper measure of damages when business is destroyed by antitrust violation is "what financial advantage would the plaintiff have gained but for the actions of the defendant?"); *Albrecht v. Herald Co.*, 452 F.2d 124, 127-28 (8th Cir. 1971) (stating that damages awardable to a private plaintiff for a Sherman Act violation "should be construed in the ordinary common law context as compensating plaintiff in full").

Based on the nurses' complaint, terms of the Policy, and principles of antitrust law, we find that the settlement does not constitute disgorgement under the Policy and is therefore covered.

2. Coverage Is Not Contrary To Michigan's Public Policy

Federal argues that its public policy issue is easily resolved in its favor because of an "ancient equity maxim": namely, that no one should benefit from his own wrongdoing. (Federal's Brief, at 25) (citing *K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 178 (6th Cir. 1996)). Federal contends that if it has to insure Beaumont, the hospital will profit from its own wrongdoing and transfer the cost of returning money wrongfully withheld to the insurer. Federal further argues that providing coverage for the settlement would encourage moral hazards because it would incentivize wrongful behavior.

Beaumont argues Michigan's public policy is much narrower than Federal claims. Citing *Vigilant Ins. Co. v. Kambly*, 319 N.W.2d 382, 384-85 (Mich. Ct. App. 1982), Beaumont contends that Michigan's public policy bar against insurance coverage is implicated only when the insured is induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising from that conduct. Beaumont notes that the cases Federal relies on are limited to intentional infliction of serious bodily injury or intentional destruction of one's own property. Beaumont argues that if intentional discrimination claims are insurable under Michigan law, there can be no overriding public policy concerns in providing coverage for business injury under antitrust laws.

Beaumont reads the Michigan cases more accurately than Federal. Under those cases, the doctrine that an insured may not profit from its own wrongdoing relates to intentional tortious or criminal acts. *See K&T Enters.*, 97 F.3d at 178 (finding public policy precluded recovery for losses sustained due to an insured's arson); *Auto-Owners Ins. Co. v. Harrington*, 538 N.W.2d 106, 109-10 (Mich. Ct. App. 1995) (finding a person who shot his neighbor's guest was not entitled to coverage under his homeowners' insurance policy); *United Gratiot Furniture Mart, Inc. v. Mich. Basic Prop.*

*Ins. Ass'n*, 406 N.W.2d 239, 242 (Mich. Ct. App. 1987) (holding an insured corporation could not recover for a fire loss caused by its controlling shareholder's arson).

As the district court noted, Federal has not identified any cases in the Sixth Circuit holding that disgorgement is not insurable. It still has yet to do so, relying only on cases not on point because they deal with intentional tortious or criminal acts.

Additionally, Federal's argument that all wrongful acts alleged to involve a statutory violation are uninsurable is equally unpersuasive. In *Bowman v. Preferred Risk Mutual Ins. Co.*, 83 N.W.2d 434, 436 (Mich. 1957), the court noted "Michigan does not as a general rule bar recovery under public liability policies because some illegal act was involved in the damage." (citing *Pawlicki v. Hollenbeck*, 229 N.W. 626 (Mich. 1930)).

For example, as Beaumont points out, it is not against Michigan's public policy for an employer to purchase insurance for intentional civil rights violations. *See North Bank v. Cincinnati Ins. Co.*, 125 F.3d 983, 988 (6th Cir. 1997).

While we must consider whether insurance coverage may encourage moral hazards, we have previously addressed this issue, noting that "common sense suggests that the prospect of escalating insurance costs and the trauma of litigation, to say nothing of the risk of uninsurable punitive damages, would normally neutralize any stimulative tendency the insurance might have." *Sch. Dist. for the City of Royal Oak v. Cont'l Cas. Co.*, 912 F.2d 844, 848 (6th Cir. 1990), *overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991).

Here, in addition to the damage to the reputation of Beaumont, the hospital also faced up to $1.8 billion in damages. The Policy limit for anti-trust claims is $25 million – far less than the threatened $1.8 billion which the plaintiffs sought jointly and severally from Beaumont. No insured is likely to bet on a gain of $25 million against a loss of $1.8 billion.

Moreover, the wrongful conduct here was not *per se* illegal. The district court awarded summary judgment in favor of the hospitals on the nurses' claim of a *per se* violation of § 1 of the Sherman Act arising from the alleged conspiracy to depress compensation levels. *Cason-Merenda*, 862 F. Supp. 2d at 641. The nurses could move forward with their "rule of reason" claim.[4] Thus, there is even less cause or need to find that coverage here would violate public policy because the nurses in the Underlying Lawsuit did not prove or even allege that Beaumont had unlawfully intended or engaged in criminal activity.

Federal's continued reliance on *Level 3* and its progeny is misplaced as well. First, as the district court noted , *Level 3* did not apply Michigan's public policy. Moreover, that case was about "seek[ing] to divest the defendant of the present value of the property obtained by fraud, minus the cost to the defendant of obtaining the property." 272 F.3d at 910-11. As discussed above, these types of cases—where the insured unlawfully obtained something from the underlying plaintiff—are inapposite: Beaumont did not unlawfully *obtain* anything *from* the nurses. Rather, it allegedly unlawfully *withheld* compensation from them.

Thus, we find that Federal's public policy claim fails.

### 3. Federal's Discovery Request Is Moot

Because the Policy requires and public policy does not preclude that Federal honor its commitment to indemnify Beaumont, there is no need for discovery on those issues. As the district court noted, the method of distribution of the settlement does not change the nature of the settlement itself. Regardless of the distribution of funds between Beaumont's own nurses and nurses employed

---

[4] Under "rule of reason" approach, a court must "engage in a thorough analysis of the relevant market and the effects of the restraint in that market." *Realcomp II, Ltd. v. Fed. Trade Comm'n*, 635 F.3d 815, 825 (6th Cir. 2011).

by the other hospitals, the settlement cannot be characterized as disgorgement.  The district court properly denied Federal's motion to compel discovery.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.