NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0049n.06

Case No. 23-3039

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

HUNTINGTON NATIONAL BANK,

  Plaintiff - Appellant,

v.

AIG SPECIALTY INSURANCE CO., et al.,

  Defendants - Appellees.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Feb 01, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

---

Before:  MOORE, GIBBONS, and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  Huntington National Bank ("Huntington") sued AIG Specialty Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (together, "AIG") alleging breach of contract and bad faith stemming from AIG's denial of insurance coverage for Huntington's settlement of a bankruptcy fraudulent transfer proceeding brought by the trustee of a bankrupt company.  In granting summary judgment for AIG, the district court held that: (1) Huntington's claim for insurance coverage was uninsurable under Ohio law, (2) Huntington's claim was independently excluded under the insurance contract's exclusion for "unrepaid, unrecoverable, or outstanding credit" and (3) the larger settlement rule did not apply to Huntington's settlement.  Huntington appealed all three holdings.  We review and conclude that (1) Huntington's claim for insurance coverage is insurable under Ohio law, and (2) Huntington's claim should not be excluded as a claim for "unrepaid, unrecoverable, or

outstanding credit." Because we find that Huntington's claim is insurable under Ohio law, we need not determine whether the district court erred by refusing to apply the larger settlement rule.

I.

AIG issued to Huntington a bankers professional liability insurance (BPL) policy for the period of January 1, 2007 to January 1, 2008. The policy provided coverage up to $15 million, after a $10 million retention.[1] Any liability exceeding the primary policy was covered by an excess policy issued by National Union for the same coverage period, which provided $10 million in excess coverage. The terms and conditions of the primary AIG policy govern both it and the excess policy. The parties do not dispute that these policies apply to Huntington's claim. We refer to these two policies together as "the insurance policy" or just "the policy."

The policy covers Huntington's "Loss . . . arising from a Claim first made against the Insured during the Policy Period . . . and reported in writing to the Insurer . . . for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services." DE 70-6, Ins. Pol., Page ID 2813. The policy goes on to define the relevant terms. *Id.*

- A "Loss" is defined in part as "damages, judgments, settlements and Defense Costs." *Id.* at 2814. Endorsement 8 modifies this definition to exclude "civil or criminal fines or penalties imposed by law, punitive or exemplary damages, . . . or matters that may be deemed **uninsurable under the law** pursuant to which this policy shall be construed." *Id.* at 2840 (emphasis added). The endorsement adds that "[i]t is further understood and agreed that the enforceability of this endorsement shall be governed by such applicable law which most favors coverage for punitive or exemplary damages." *Id.*

- A "Claim" means, in part, "a written demand for monetary or non-monetary relief." *Id.* at 2813.

---

[1] The Lender's Liability Extension in Endorsement 7 appears to cap liability for the insured's performance of Lending Acts at $5,000,000.

- A "Wrongful Act" means, in part, "any act, error or omission in the rendering of or failure to render Professional Services." *Id.* at 2815.

- "Professional Services" means "those services of the Company permitted by law or regulation rendered by an Insured at any time whether before, on or after the inception date of this policy, pursuant to an agreement with the customer or client." *Id.*

The policy contains several exclusions to coverage, but relevant here are Endorsement 8 (described above) and Endorsement 7. Endorsement 7 establishes exclusions specific to Huntington's performance of "Lending Acts." *See id.* at 2838 ("The following exclusions shall only apply with respect to any Insured's performance of Lending Acts."). Lending Acts are defined as "any act performed by an Insured for: (i) a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit." *Id.* at 2837. The relevant exclusion clarifies that "[t]he Insurer shall not be liable to make any payment for Loss in connection with any Claim or Claims made against any Insured: for the principal and/or interest of any **unrepaid, unrecoverable, or outstanding credit**." *Id.* at 2838 (emphasis added).

The policy was implicated when Huntington unwittingly became the bank for a fraudulent company, Cyberco Holdings, Inc. Barton Watson perpetuated a Ponzi Scheme through two fraudulent companies, Cyberco Holdings, Inc. and Teleservices Group, Inc. *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 720 (6th Cir. 2017). From September 2002 to October 2004, Huntington served as Cyberco's bank and extended multiple loans to Cyberco, based on Watson's representation that Cyberco was a computer services business that needed capital. *Id.* Huntington initially loaned Cyberco $9 million, comprised of a revolving line of credit based on Cyberco's receivables, a term note, and letters of credit. *Id.*; *In re Teleservices Grp., Inc.*, 444 B.R. 767, 775 (Bankr. W.D. Mich. 2011), *objections overruled sub nom. Meoli v. Huntington Nat'l Bank*, 2015 WL 5690953 (W.D. Mich. Sept. 28, 2015), *rev'd in part Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017). Huntington later increased Cyberco's line of credit, financed

various equipment acquisitions, and issued additional letters of credit. *In re Teleservices*, 444 B.R. at 776.

Cyberco represented that it purchased computer equipment from a vendor, Teleservices. *Meoli*, 848 F.3d at 720. In reality, Teleservices was a paper company that Watson created to perpetuate his fraud. *Id.* Watson borrowed money from financing companies and instructed them to send the money directly to Teleservices, Cyberco's supposed "vendor," to pay for the computer equipment. *Id.* Once the financing companies paid Teleservices, Watson took the money from Teleservices's bank account and deposited it into Cyberco's bank account at Huntington. *Id.*

Huntington grew suspicious of Cyberco around September 2003. First, Cyberco had deposited a series of large checks from Teleservices in the months preceding September 2003. *Id.* at 720–21. Huntington asked Watson about this, and Watson explained that Teleservices was a new addition to Cyberco's holdings and that it was collecting Cyberco's receivables. *Id.* at 721. This explanation contradicted Watson's previous representation that Teleservices was Cyberco's vendor, but the Huntington employees did not know or realize this. *Id.* Second, Cyberco refused to use the lockbox that Huntington had set up. *Id.* A lockbox is a service offered by a bank by which the bank manages the check-depositing process. *Id.* Cyberco's refusal to use the lockbox blinded Huntington to Cyberco's source of money. *Id.* Third, Cyberco never gave Huntington any audited financial statements, despite the loan agreement's requirement to do so. *Id.* Fourth, Cyberco had previously overspent its deposits, and Huntington had covered the excess spending by further extending Cyberco's loan. *Id.* And finally, in April 2004, Huntington found an obvious discrepancy in Cyberco's receivables aging report, "which is a standard accounting report that lists unpaid customer invoices," in which Cyberco listed competing computer services companies as its debtors. *Id.* at 721–22.

The Huntington team responsible for Cyberco reported this to Huntington's security department. *Id.* at 722. Huntington's security department then discovered that the FBI was investigating Cyberco, that Watson had been permanently blacklisted by the National Association of Securities Dealers, and that he had confessed to and served time for fraud-related crimes. *Id.* But the Huntington security department did not share any of this with the team responsible for Cyberco. *Id.* From May 2004 to October 2004, Cyberco gradually repaid its entire loan, a relief for the Huntington team. *Id.* Later in 2004, the FBI raided Cyberco's offices, and Watson committed suicide shortly thereafter. *Id.*

Following the FBI raid, creditors of Cyberco and Teleservices, both entirely fraudulent companies, discovered that the companies were bankrupt. *See id.* at 722–23. The trustees of Cyberco and Teleservices filed adversary proceedings against Huntington, claiming that Huntington put its desire to be repaid ahead of its concerns that Watson was committing fraud and, by doing so, perpetuated the Ponzi scheme to its benefit and other lenders' detriment. Both complaints included allegations of fraudulent transfers and sought recovery of those transfers from Huntington.

The bankruptcy proceeding was long and complex, including two trials and multiple opinions. *Meoli*, 848 F.3d at 722. Under its fraudulent transfer claims, the trustee sought to recover money Teleservices transferred into Cyberco's Huntington account totaling approximately $73 million. *In re Teleservices*, 444 B.R. at 772. Huntington argued that the transfers were not recoverable because it accepted them in good faith under 15 U.S.C. § 548(c) and § 550(b)(1). *Id.* at 773.

The fraudulent transfer claim wound its way to this court in 2017. *See generally Meoli*, 848 F.3d 716 (6th Cir. 2017). *Meoli* divided the transfers into three types:

> (i) direct loan repayments, which Teleservices sent directly to Huntington to pay down Cyberco's debt to Huntington; (ii) indirect loan repayments, which Teleservices sent to Cyberco's deposit account at Huntington, [] which Cyberco later used to repay its debt to Huntington; and (iii) excess deposits, which Teleservices sent to Cyberco's deposit account at Huntington, and which Cyberco later withdrew or the government later seized.

*Id.* at 719.

First, *Meoli* held that the trustee could not recover the excess deposits (which totaled approximately $55 million), because Huntington was not a "transferee" of these excess deposits under the bankruptcy code. *Id.* at 724–29. To be a transferee, the entity must have "dominion and control" over the deposits, and Huntington did not have "dominion and control" over the excess deposits. *Id.* at 725.

Second, because Huntington conceded that it was an initial transferee of the direct loan repayments and a subsequent transferee of the indirect loan repayments, *Meoli* considered Huntington's affirmative good faith defense under both 11 U.S.C. § 548(c) and § 550(b)(1). *Id.* at 729. *Meoli* held that Huntington's proven good faith ended on April 30, 2004, when a critical breakdown in Huntington's internal communications occurred when Huntington's investigator failed to disclose Watson's past to the team managing Cyberco. *Id.* at 730. The trustee could thus recover all loan repayments after April 30, 2004, which included all the direct loan repayments and some indirect loan repayments. *Id.*

*Meoli* remanded the question regarding recovery of the indirect loan repayments between September 25, 2003 and April 30, 2004 to the bankruptcy court for a determination of whether Huntington had an affirmative defense that it lacked "knowledge of the voidability of the transfers" under § 550(b)(1) during that time period. *Id.* The trustee could recover the indirect loan repayments made between those two dates only if the court concluded on remand that Huntington's proven lack of knowledge of the voidability of the transfers ceased during that period. *Id.*

On remand, Huntington argued it was not liable for any repayments before April 30, 2004, and that its liability was thus limited to the $12,821,897.07 in loan repayments for which this court in *Meoli* had already found Huntington liable. On the other hand, the trustee argued that Huntington had knowledge of the voidability of the transfers it received after November 16, 2003, making $35,968,475, plus interest, the proper recoverable amount. In March 2018, Huntington settled with the trustee for $32,000,000.

The settlement was not an admission of liability, and the settlement agreement expressly disclaimed any liability, culpability, fault, or wrongdoing. DE 70-3, Settlement Agr., Page ID 2653 (declaring that nothing in the settlement agreement is or shall be construed or deemed to be "an admission or concession of liability, culpability or fault, an admission or concession of the merit or validity of any claims asserted in connection with the Adversary Proceeding, each of which is expressly denied"); *see also id.* at 2661. Huntington denied "any and all wrongdoing of any kind whatsoever on the part of itself" and any employees. *Id.* at 2653; *see also id.* at 2661.

Throughout the bankruptcy litigation, Huntington sent AIG several requests for coverage. In March 2007, Huntington sent AIG a copy of the bankruptcy summons and complaint requesting a coverage analysis. AIG denied coverage in April 2007, relying on Endorsements 5, 7, and 10. In April 2013, Huntington provided AIG an update on the litigation and attached the amended complaint and one of the bankruptcy court's opinions. AIG again disclaimed coverage, acknowledging that there was "potential coverage" under the policy because the Wrongful Acts alleged arose from Huntington's performance of banking services to Cyberco, but citing Endorsements 7 and 10 as excluding coverage. Finally, in July 2018, Huntington sent AIG a demand letter for payment of $15 million. In August 2018, AIG again disclaimed coverage, citing primarily Endorsements 7 and 8.

Huntington subsequently sued AIG, alleging breach of contract and bad faith stemming from the denial of coverage. Huntington moved for partial summary judgment, requesting summary judgment on the existence of coverage under the insurance policy. AIG also moved for summary judgment, asserting that Huntington's settlement payment was not a "Loss" under the policy and, even if it was, Endorsements 5, 7, and 10 precluded coverage.

The district court granted AIG's motion for summary judgment on the grounds that Huntington's claim was uninsurable under Ohio law. The district court also granted summary judgment for AIG on the grounds that Huntington's claim was independently excluded by Endorsement 7, which bars recovery for "unrepaid, unrecoverable, or outstanding credit." The district court concluded that Endorsement 7 unambiguously barred Huntington's claim. Finally, the district court held that the larger settlement rule, which allows coverage for some uninsurable settlements, did not apply to Huntington's claim.

II.

This court reviews de novo a district court's grant of summary judgment. *Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 561 (6th Cir. 2023). "Summary judgment is appropriate only where there is no genuine dispute of material fact, entitling the moving party to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). "This standard of review remains the same [when] reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021). Addressing "cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

As a federal court sitting in diversity, we must apply Ohio law to this question of contract interpretation. *Westfield Nat'l Ins. Co.*, 57 F. 4th at 561 (citing *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 402 (6th Cir. 2019)). "Absent controlling authority from the [Ohio] Supreme Court, we look to the decisions of [Ohio] appellate courts and other relevant 'data' to predict how the [Ohio] Supreme Court would rule if presented with the question before us." *Id.* (citing *OneBeacon Am. Ins. Co. v. Am. Motorists Ins. Co.*, 679 F.3d 456, 460 (6th Cir. 2012)).

Under Ohio law, an insurance policy is a contract between the insurer and the insured. *Nationwide Mut. Ins. Co. v. Marsh*, 472 N.E.2d 1061, 1062 (Ohio 1984). The interpretation and construction of insurance policies is a matter of law to be determined by the court using general rules of contract interpretation and construction. *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982). "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The court must examine the insurance contract as a whole and presume the language used in the policy reflects the intent of the parties. *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007). "[W]ords and phrases used in an insurance policy must be given their natural and commonly accepted meaning, where they in fact possess such meaning." *Gomolka*, 436 N.E.2d at 1348. "Technical terms will be given their technical meaning, unless a different intention is clearly expressed." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). Where the provisions of an insurance policy are clear and unambiguous, courts must apply the terms as written and not enlarge the contract by implication "nor read into the contract a meaning not placed there by the parties." *Gomolka*, 436 N.E.2d at 1348. A provision in an insurance policy is ambiguous if it has more than one reasonable interpretation. *See Hacker v. Dickman*, 661 N.E.2d 1005, 1006 (Ohio 1996) ("It is

only when a provision in a policy is susceptible of more than one reasonable interpretation that an ambiguity exists in which the provision must be resolved in favor of the insured."). "A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987).

It is "well-settled" in Ohio law that, "where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988); *see also Home Indem. Co. of N.Y. v. Village of Plymouth*, 64 N.E.2d 248, 250 (Ohio 1945) ("Courts universally hold that policies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretation, will be construed most favorably to the insured."). In other words, when the parties have offered their own separate interpretations of the policy language, both of them plausible, the court must "resolve any uncertainty in favor of the insured." *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 424 (Ohio 2010). Because "insurance policies are interpreted strictly against the insurer, 'it will not suffice for [an insurer] to demonstrate that its interpretation is more reasonable than the policyholder's.'" *Andersen v. Highland House Co.*, 757 N.E.2d 329, 333 (Ohio 2001) (citation omitted).

"Exclusions of coverage must be clear and unambiguous to be enforceable." *Neal-Pettit*, 928 N.E.2d at 424. The insurer, as the drafter, "is responsible for ensuring that the policy states clearly what it does and does not cover." *Id.* at 425. "[T]o defeat coverage, 'the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question.'" *Andersen*,

757 N.E.2d at 332 (quoting Reiter, Strasser & Pohlman, *The Pollution Exclusion Under Ohio Law: Staying the Course*, 59 U. CIN. L. REV. 1165, 1179 (1991)). Where exceptions, qualifications, or exemptions have been added to an insurance contract, there is a general presumption that anything not clearly excluded by such provisions is included in the insured's coverage. *Id.* In other words, "if a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered." *Id.* The court will not read language into the contract. *See Neal-Pettit*, 928 N.E.2d at 425.

An insured "has the burden of proving a loss and demonstrating coverage under the policy." *Sharonville v. Am. Emps. Ins. Co.*, 846 N.E.2d 833, 838 (Ohio 2006) (quoting *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 418 N.E.2d 1381, 1383 (Ohio 1981)). An insurer bears the burden of proving the applicability of an exclusion to its policy. *Continental Ins. Co. v. Louis Marx Co., Inc.*, 415 N.E.2d 315, 317 (Ohio 1980).[2]

## III.

On appeal, Huntington argues that its claim is insurable under Ohio law, that the exclusion in Endorsement 7 is at least ambiguous, and that this ambiguity should be resolved in its favor. We agree.

---

[2] The parties disagree as to who had the burden to prove the claim was uninsurable under Ohio law. AIG argues that proof of an insured loss is a necessary first step to establishing coverage, and that does not change simply because the definition of "Loss" includes limitations. Huntington maintains the district court rightly rejected this reasoning. The district court rejected AIG's argument because the location of exclusionary language does not change the fact that it is an exclusion, and this is true even if the exclusion is within the definition of "Loss." The district court is correct that the "uninsurable under the law" provision is an exclusion to coverage, meaning AIG carries the burden to prove it. *See Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, 566 F. Supp. 3d 879, 897 (N.D. Ill. 2021) ("The Court finds that the language ['uninsurable under the applicable law'] is an exclusion notwithstanding the fact that it is located in the section defining 'Loss' rather than in the 'Exclusions' section of the Primary Policy."). AIG is right that parties cannot agree to insure that which is uninsurable under the law. But AIG still has the burden to prove what is excluded as uninsurable under the law.

A.

Under the insurance policy, the definition of "Loss" excludes "civil or criminal fines or penalties imposed by law, punitive or exemplary damages . . . or matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed." DE 70-6, Ins. Pol., Page ID 2840. The parties agree that Ohio state law controls the policy. The question is whether Huntington's claim is uninsurable under Ohio law.[3]

Huntington's claim was for $15,000,000 of a $32,000,000 settlement of a bankruptcy fraudulent transfer proceeding. Ohio law does not explicitly resolve the question of whether a claim for settlement of a bankruptcy fraudulent transfer action is uninsurable. Because there is no controlling authority from the Ohio Supreme Court, this panel must look to the decisions of Ohio

---

[3] As an initial matter, the phrase "uninsurable under the law pursuant to which this policy shall be construed" is unambiguous. No Ohio court has held that the word "uninsurable" or phrase "uninsurable under the law" is ambiguous. Ohio courts resort to extrinsic evidence only where "the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly*, 509 N.E.2d at 413. Contrary to Huntington's argument, *Andersen* did not broadly hold that courts should look beyond the "bare words" of an exclusion and consider extrinsic evidence of the exclusion's purpose or "*raison d'etre*." *Andersen* reached that point only after acknowledging that there was more than one reasonable interpretation to the policy exclusion before it, and after noting that the policy never explicitly excluded the claim at issue. *See Andersen*, 757 N.E.2d at 332. *Andersen*'s foray into extrinsic evidence was thus predicated on the fact that there was more than one reasonable interpretation of the insurance policy. To the extent that Sixth Circuit case law reasons to the contrary, it is contradictory to Ohio case law and thus should not be followed here. *Compare Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 684 n.12 (6th Cir. 2000) ("Extrinsic evidence can become a consideration *before* an ambiguity has been identified from the face of the contract as a matter of law, in the limited sense that such evidence can assist the court in determining whether, as a matter of law, two plausible interpretations exist . . . to give rise to the *existence* of an ambiguity."), *and Bondex Int'l, Inc. v. Hartford Accident and Indem. Co.*, 667 F.3d 669, 680 (6th Cir. 2011) ("Under Ohio law, we may consider extrinsic evidence 'to interpret, but not to contradict, the express language.'") (quoting *Ohio Hist. Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 344 (Ohio Ct. App. 1989)), *with Ohio Hist. Soc'y*, 583 N.E.2d at 344 ("Parol evidence is admissible only if the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language."). Ohio law is clear that the language must be ambiguous before the court considers extrinsic evidence.

appellate courts and other relevant data to predict how the Ohio Supreme Court would rule if addressing the current question. *See Westfield Nat'l Ins. Co.*, 57 F.4th at 561.

Ohio statutes and case law together demonstrate that what is uninsurable under Ohio law is quite narrow. There are only two categories of claims that are uninsurable under Ohio law as a matter of public policy: those based on punitive damages and those based on most intentional torts.

*Casey v. Calhoun*, 531 N.E.2d 1348 (Ohio Ct. App. 1987), established as a matter of law that punitive damages are uninsurable under Ohio law. Punitive damages function to "punish an offender for the wanton, reckless, malicious or oppressive character of the act committed and to deter others from committing similar acts." *Id.* at 1349. Unlike compensatory damages, which "make whole an injured party," punitive damages are "an enhancement of the actual loss, representing a 'windfall' to the injured party." *Id.* *Casey* explained that Ohio public policy insulates insurers from indemnifying punitive damages for three reasons. *See id.* First, a culpable tortfeasor must not be able to escape the intended punishment by shifting the monetary burden of his acts to the insurance company. *Id.* Second, requiring the culpable tortfeasors to cover the punitive damages, without being able to shift the burden to insurers, creates a deterrent effect. *Id.* And finally, because insurance would already cover the plaintiff's actual loss, there is no need for insurance to pay punitives, as the plaintiff has already been made whole. *Id.*

*Casey* then noted that a declaration of public policy "normally is a function of the legislative branch," and that courts should avoid balancing the competing policy concerns and instead look to state statutes for guidance. *Id.* at 1350. *Casey* analyzed Ohio state statutes and bills that prohibit the payment of punitive damages in uninsured and underinsured motorist coverage and concluded that the Ohio legislature "assumed its role as policymaker" and "firmly expressed its intention that an individual must be prohibited from insuring against his own

intentional or malicious acts." *Id.* at 1350–51. *Casey* also noted the Ohio Supreme Court's longstanding position that "public policy is contrary to insurance against intentional torts." *Id.* at 1351 (quoting *Wedge Prods., Inc. v. Hartford Equity Sales Co.*, 509 N.E.2d 74, 76 (Ohio 1987)). Based on the state statutes and Ohio Supreme Court cases analyzed, *Casey* concluded that "[b]oth the legislature and judiciary have determined that insuring against punitives is detrimental to the welfare and the morals of the public." *Id.*

*Casey* is thus instructive on two key points: (1) punitive damages are uninsurable under Ohio law; and (2) Ohio courts should look to pronouncements from the legislature as the proper policymaker and avoid declarations of public policy without legislative support. *See id.* at 1349–52.

An equally prevailing trend under Ohio state case law is the proposition that damages for most, but not all, intentional torts are uninsurable. *Gearing v. Nationwide Insurance Co.* recognized that Ohio public policy generally prohibits obtaining insurance to cover damages caused by intentional torts. 665 N.E.2d 1115, 1118 (Ohio 1996) ("Liability insurance does not exist to relieve wrongdoers of liability for intentional, antisocial, [or] criminal conduct."). But later cases pulled back the broad pronouncement in *Gearing*.

*Buckeye Union Insurance Co. v. New England Insurance Co.* clarified that "[n]ot all intentional torts are uninsurable in Ohio." 720 N.E.2d 495, 498 (Ohio 1999). Ohio courts distinguish between two types of intentional torts with respect to insurance coverage: direct-intent torts, where the tortfeasor acts and the expected results manifest, and "substantially certain" torts, where a tortfeasor acts with the belief that a specific outcome is likely to occur, even if he does not desire that result. *Id.* Only direct-intent torts, where the tortfeasor has an intent to injure, are uninsurable. *Id.* at 499 ("[A]n intent to injure, not merely an intentional act, is a necessary element

to uninsurability."). Making direct-intent torts uninsurable prevents insurance coverage from encouraging those who would deliberately harm another. *Harasyn v. Normandy Metals, Inc.*, 551 N.E.2d 962, 965 (Ohio 1990).

"Whether the insured had the necessary intent to cause injury is a question of fact." *Buckeye Union*, 720 N.E.2d at 499. In *Buckeye Union*, Buckeye Union Insurance Company, the insurer, refused to settle a claim it believed it was not obligated to settle based on an interpretation of its insurance contract. *Id.* at 497–98. Based on this refusal to settle, Ohio courts found Buckeye guilty of "bad faith" with "actual malice." *Id.* at 498. But *Buckeye Union* held that that conduct was not the type of intentional tort that was uninsurable under Ohio law. *Id.* at 499 ("This court does not infer specific intent to injure from an act of contract interpretation."). Specifically, neither the judicial finding of "bad faith" nor "actual malice" included "intent to injure" as a necessary element of the claim. *Id.* at 499–501. Because there was no finding at the trial court that Buckeye acted with an intent to injure, Buckeye's bad-faith failure to settle the insurance claim was not an uninsurable act. *Id.* at 501. Subsequent Ohio cases acknowledged and followed *Buckeye Union*'s pronouncement that not all intentional torts are uninsurable under Ohio law.[4]

---

[4] *See Hoyle v. DTJ Enters., Inc.*, 36 N.E.3d 122, 131–32 (Ohio 2015) ("But not all intentional torts are uninsurable in Ohio.") (citing *Buckeye Union*, 720 N.E.2d at 498); *Doe v. Shaffer*, 738 N.E.2d 1243, 1246 (Ohio 2000) (finding that the "better" public policy position is "to prohibit insurance only for those intentional torts where the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character") (internal citations and quotations omitted); *Horace Mann Ins. Cos. v. Bradwell*, No. 00AP-780, 2001 WL 96044, at *3 (Ohio Ct. App. Feb. 6, 2001) (noting that *Buckeye Union* "concluded that an insurer can be guilty of maliciously failing to settle a tort case against its insured without necessarily committing the type of intentional tort that is uninsurable, as a matter of public policy, under Ohio law" and that *Buckeye Union*'s pronouncement "that the inquiry into intent turns on a factual analysis unless the act and the harm 'are so intertwined' that 'to intend the act is also to intend the harm' is instructive") (quoting *Buckeye Union*, 720 N.E.2d at 283–84); *see also Chiquita Brands Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 988 N.E.2d 897, 900 (Ohio Ct. App. 2013) ("Ohio public policy *generally* prohibits obtaining insurance to cover damages caused by intentional torts.") (emphasis added); *Int'l Surplus Lines Ins. Co. v. Princehorn*, No. 16463, 1994 WL 175672,

These two prevailing trends in Ohio case law—that punitive damages and certain intentional torts are uninsurable under the law—combined in a few cases which are instructive here. *The Corinthian v. Hartford Fire Insurance Co.* demonstrates that the bar on coverage for punitive damages extends only to damages awarded based on an "individual's malicious, willful, or intentional conduct," and not simply because a statute invokes the phrase "punitive damages." 758 N.E.2d 218, 221 (Ohio Ct. App. 2001). *The Corinthian* considered whether an insurance company was obligated to pay a punitive damages judgment awarded under an Ohio statute that allowed for recovery of punitive damages "without a showing of intent, malice, willfulness, or recklessness." *Id.* at 220. *The Corinthian* concluded there was no public policy justification for holding the punitive damages at issue uninsurable, because the public policy justifications did not apply where the damages were awarded "without any finding of malice, ill will, or other culpability." *Id.* at 222–23. Punitive damages not based on a finding of actual malice "are not punishment in any traditional sense," and there is little deterrent effect from punitive damages awarded without a finding of ill will or malice. *Id.* at 223. *The Corinthian* thus held that coverage for the statutory punitive damages at issue did not violate public policy. *Id.*

*Motorists Mutual Insurance Co. v. Dandy-Jim, Inc.* reached the same result in determining the insurability of treble damages levied under the federal Telephone Consumer Protection Act ("TCPA"). 912 N.E.2d 659, 661, 667 (Ohio Ct. App. 2009). Under the TCPA, if the violation was committed "willfully or knowingly," treble damages could be awarded. *Id.* at 667–68 (quoting 47 U.S.C. § 227(b)(3)). *Motorists* noted that no showing of intentional malice was required to obtain treble damages under the TCPA, even if the violation was committed "willfully," because

_____

at *1 (Ohio Ct. App. May 11, 1994) ("While Ohio courts have recognized a public policy prohibition against the insurance of intentional torts, the reasoning behind such a prohibition is inapplicable where the conduct is less than knowing or intentional.") (internal citation omitted).

a willful violation under the TCPA required only that the defendant "consciously and deliberately committed or omitted an act that violated the statute, irrespective of any intent to violate the law." *Id.* at 668 (quoting *Charvat v. Ryan*, 879 N.E.2d 765, 771 (Ohio 2007)). A willful or knowing violation of the TCPA thus was not tantamount to an "intentionally malicious act" that gives rise to punitive damages. *Id.* *Motorists* also noted that there was no evidence that Congress intended TCPA damages to be punitive, and instead the purpose of the TCPA damages provision was to "liquidate uncertain actual damages and to encourage victims to bring suit to redress violations." *Id.* at 667 (quoting *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 300 F. Supp. 2d 888, 893 (E.D. Mo. 2004)). The TCPA was thus a remedial law, not a punitive one. *Id.* Because a willful or knowing violation of the TCPA differed from an intentionally malicious act, *Motorists* held that there was no public policy that would prohibit insurance coverage for treble damages under the TCPA. *Id.* at 668.

Finally, after reviewing the landscape of Ohio law, *Neal-Pettit v. Lahman* held that an award of attorney's fees based on an award of punitive damages was still insurable under the law. 928 N.E.2d at 422. *Neal-Pettit* acknowledged that Ohio public policy prevents insurance contracts from insuring against claims for punitive damages based on an insured's malicious conduct. *Id.* at 425. Even so, *Neal-Pettit* determined that allowing insurance for attorney's fees would not contravene public policy, because doing so would not encourage wrongful behavior—the tortfeasors would remain liable for punitive damages awarded for their own "malicious actions." *Id.* *Neal-Pettit* thus held that payment by the insurer of an attorney fee award based on a punitive damages award did not violate Ohio public policy. *Id.*

Taken together, Ohio law demonstrates that for insurance coverage to be uninsurable under the law, the damages claimed must be based on an intent to injure, malice, ill will, or other similar

culpability.   *See The Corinthian*, 758 N.E.2d at 223 ("malice, ill will, or other culpability"); *Buckeye Union*, 720 N.E.2d at 499 ("intent to injure"); *see also Motorists*, 912 N.E.2d at 668 ("intentionally malicious act"); *Neal-Pettit*, 928 N.E.2d at 425 ("malicious actions").

Huntington argues that the settlement payment to the trustee is insurable under Ohio law, contrary to the district court's holding, because the settlement payment was not akin to punitive damages and was not intended to punish an intentional bad act.  We agree.  The liability in *Meoli* turned only on whether Huntington was a "transferee" under § 550(a)(1).  *Meoli*, 848 F.3d at 724 n.2.  Holding otherwise, as the district court did, would wrongly expand what is uninsurable under Ohio law and contravene the well-established principle in Ohio that policymaking is for the legislative branch, not the courts.  *See Casey*, 531 N.E.2d at 1350.

Huntington is correct that no showing of intentional malice by the transferee is required under the fraudulent transfer provisions of the bankruptcy code, meaning that an order to return funds is not a "punishment in any traditional sense."  *See The Corinthian*, 758 N.E.2d at 223.  The bankruptcy code generally limits a bankruptcy trustee's recovery of transfers to the avoidable transfers, *see* 11 U.S.C. § 548(a)(1), that are received by a "transferee," 11 U.S.C. § 550(a).  *See Meoli*, 848 F.3d at 724 n.2.  A trustee may avoid a transfer of money that the debtor made with the actual intent to defraud an entity to which the debtor was indebted.  *See* 11 U.S.C. § 548(a)(1)(A). The key inquiry of § 548(a)(1) is the "actual intent" of the *debtor* "to hinder, delay, or defraud." *See, e.g.*, *Zentek GBV Fund IV v. Vesper*, 19 F. App'x 238, 244 n.4 (6th Cir. 2001).  "Section 548(a)(1)(A) does not contain any reference to the state of mind or knowledge of the transferee." 5 Collier on Bankruptcy ¶ 548.04 (16th ed. 2023).  The state of mind of the transferee is irrelevant—fraudulent conveyance claims "turn on the intent of the debtor in making the transfer." *Bash v. Textron Fin. Corp.*, 524 B.R. 745, 756 (N.D. Ohio 2015) (quoting *In re Bayou Grp., LLC*,

439 B.R. 284, 304 (Bankr. S.D.N.Y. 2010)); *see also In re Adler, Coleman Cleaning Corp.*, 263 B.R. 406, 451 (Bankr. S.D.N.Y. 2001) ("[F]or the purposes of avoidance pursuant to § 548 the transferee's good faith or lack of it does not matter."). Section 550(a) "holds initial transferees strictly liable for any fraudulent transfers they receive." *In re Hurtado*, 342 F.3d 528, 532 (6th Cir. 2003). If a trustee may avoid a transfer under § 548(a)(1), then the trustee may recover, for the benefit of the estate, the property transferred, or the value of such property, from the initial transferee or subsequent transferee. *See* 11 U.S.C. § 550(a)(1); *see also Meoli*, 848 F.3d at 724 n.2.

A transferee may raise an affirmative defense to avoidance of the transfer by proving its "good faith" under § 548(c) or § 550(b)(1). *See* 11 U.S.C. § 548(c) (requiring only "good faith" and taking "for value"); 11 U.S.C. § 550(b)(1) (requiring "good faith," taking "for value," and "without knowledge of the voidability of the transfer avoided"); *Meoli*, 848 F.3d at 729–30. *In re Teleservices* held that Huntington lacked good faith under § 548(c) because Huntington had "turned a blind eye to the mounting evidence that the transfers from Teleservices were not the collected Cyberco receivables as it had been led to believe." *In re Teleservices*, 444 B.R. at 830. *Meoli* affirmed that formulation. *See Meoli*, 848 F.3d at 730. *Meoli* next noted that courts have struggled to define good faith in the context of § 550(b)(1), which requires both "good faith" and taking without knowledge of the voidability of the transfer avoided. *Id.* at 734. But *Meoli* again approved the district court's formulation of good faith here—"whether Huntington legitimately continued to believe that Teleservices's transfers to Cyberco's account were merely Cyberco's receivables that Teleservices had collected"—as not erroneous. *Id.* *Meoli* remanded for a determination under the "without knowledge of the voidability" prong of § 550(b)(1), asking whether the facts were "such that they would have 'place[d] a reasonable person on notice that the

transfer was illegitimate, and by extension, that it was voidable,' given the investigative avenues that existed, the reasonableness of pursuing those investigations, and the findings that those reasonable investigations would have yielded." *Id.* at 733 (quoting *In re Nordic Village, Inc.*, 915 F.2d 1049, 1056 (6th Cir. 1990), *judgment rev'd on other grounds*, 503 U.S. 30 (1992)).

Liability under the fraudulent conveyance statutes is not tantamount to the type of culpable conduct that Ohio courts have held precludes insurance recovery. As discussed above, the fraudulent conveyance statutes create a strict liability scheme for transferees. *See In re Hurtado*, 342 F.3d at 532. The intent of the transferee—Huntington, here—is irrelevant to liability. *See Bash*, 524 B.R. at 756. "Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive." *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994). This statutory scheme is similar to the TCPA in *Motorists*, which is also remedial, not punitive. *See Motorists*, 912 N.E.2d at 667 ("[T]he TCPA is a remedial law."). Ohio courts thus would not hold that the liability of a transferee for a fraudulent transfer is uninsurable under the law.

Additionally, the formulation of good faith in this case—and Huntington's lack of it—demonstrates that it is not equivalent to an intent to injure, malice, ill will, or other similar culpability that renders claims uninsurable under Ohio law. Good faith is an affirmative defense, and its formulation—"whether Huntington legitimately continued to believe that Teleservices's transfers to Cyberco's account were merely Cyberco's receivables that Teleservices had collected"—is not tantamount to an intent to injure, malice, ill will, or other similar culpability. *See Meoli*, 848 F.3d at 734; *The Corinthian*, 758 N.E.2d at 223 ("malice, ill will, or other culpability"); *Buckeye Union*, 720 N.E.2d at 499 ("intent to injure"); *see also Motorists*, 912 N.E.2d at 668 ("intentionally malicious act"); *Neal-Pettit*, 928 N.E.2d at 425 ("malicious actions").

*Buckeye Union* demonstrates that a finding by Ohio courts of "bad faith with actual malice" does not bar insurability, because there was no specific finding that the insured had "acted with an intent to injure." *Buckeye Union*, 720 N.E.2d at 501. Here, although Huntington may have suspected that the loan repayments would harm creditors in an as-yet-initiated bankruptcy proceeding, Huntington did not desire that result—it merely desired that its loan be repaid. Huntington's behavior was thus within the "substantially certain" category of torts, where an actor does something "which he believes is substantially certain to cause a particular result, even if the actor does not desire that result," a category of torts that is insurable under Ohio law. *Id.* at 498 (quoting *Harasyn*, 551 N.E.2d at 964). In short, even if Huntington's actions had a likelihood of injuring creditors, Huntington did not intend that result. A lack of good faith did not require a finding of any intent to injure.

Finally, for the same reason, any potential "knowledge of the voidability of the transfer avoided" does not render Huntington's claim uninsurable. *See* 11 U.S.C. § 550(b)(1). *Meoli* interpreted that provision of § 550(b)(1) to mean that the facts were "such that they would have 'place[d] a reasonable person on notice that the transfer was illegitimate, and by extension, that it was voidable,' given the investigative avenues that existed, the reasonableness of pursuing those investigations, and the findings that those reasonable investigations would have yielded." *Meoli*, 848 F.3d at 733 (quoting *In re Nordic Village, Inc.*, 915 F.2d at 1056). Reasonable notice that a transfer was illegitimate is not synonymous with an intent to injure, and the standard carries no requirement of a finding of malice, ill will, or other culpability. In sum, because Huntington's settlement payment was not tied to any malicious act or intent to injure, Ohio courts would not hold Huntington's claim uninsurable under Ohio law.

Ohio's twin public policy aims—to prevent the culpable party from escaping punishment and deterrence—support this result. *See Casey*, 531 N.E.2d at 1349. As in *The Corinthian* and *Motorists*, the liability under the fraudulent transfer statute is not a punishment in any traditional sense. *See The Corinthian*, 758 N.E.2d at 223 ("'Punitive damages' that are not based on a finding of actual malice or any other state of mind are not punishment in any traditional sense."); *Motorists*, 912 N.E.2d at 668 (finding that because a willful or knowing violation of the TCPA was different from an intentionally malicious act that could give rise to punitive damages, there was no public policy prohibiting insurance coverage for TCPA treble damages). Insuring Huntington for its fraudulent transfer settlement thus would not allow Huntington to escape any punishment in the traditional sense. Similarly, finding coverage uninsurable here would not create any deterrent effect. As *The Corinthian* noted, there is little deterrent effect from punitive damages awarded without a finding of ill will or malice. *The Corinthian*, 758 N.E.2d at 223. Here, Huntington had no ill will or malice when it made the loan or sought its repayment, obviating any deterrent effect of denying coverage.

AIG's arguments to the contrary are unavailing. The district court held, and AIG argues on appeal, that Huntington's settlement with the trustee is not an insurable loss. The district court and AIG relied primarily on *Level 3 Communications, Inc. v. Federal Insurance Co.*, 272 F.3d 908 (7th Cir. 2001). *Level 3* dealt with a securities class action, in which a group of plaintiffs sold shares in their corporation to Level 3 and alleged they had done so based on Level 3's fraudulent misrepresentations. *Id.* at 910. Level 3 settled with the plaintiffs and then sought coverage for the settlement via its Directors and Officers insurance ("D&O") policy from Federal Insurance Company. *Id.* at 909. Federal argued that the settlement was not a "loss" within the meaning of its insurance policy because the relief sought in the suit against Level 3 was restitutionary in nature.

*Id.* at 909–10.  The *Level 3* court agreed, stating that the "interpretive principle for which Federal contends—that a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain—is clearly right."  *Id.* at 910.

To show that the insurance policy would not be rendered illusory by its decision, the *Level 3* court described situations in which there would be a covered loss.  *See id.* at 911.  The difference between the facts of *Level 3* and the hypotheticals raised was that Level 3's fraudulent representations led to an illicit financial gain.  *Id.*  Level 3's settlement of the class action had thus deprived it of the net benefit from its "unlawful act," or fraud.  *Id.*  With this distinction in mind, the *Level 3* court opined that "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return."  *Id.*

*Level 3* does not control the result here, because it is an out-of-circuit case that does not apply Ohio law.  Even so, *Level 3* is not in tension with *Casey*, *Buckeye Union*, *Gearing*, *Motorists*, *The Corinthian*, or any of the other cases addressing uninsurability under Ohio law.  Instead, the holding of *Level 3* is in line with Ohio public policy: An entity, like Level 3, is not owed coverage for a loss caused by its own intentionally malicious act, like fraud.  *See Motorists*, 912 N.E.2d at 667–68; *The Corinthian*, 758 N.E.2d at 223.  *Level 3* deals with a direct action—Level 3 made fraudulent misrepresentations that induced plaintiffs to sell it shares.  272 F.3d at 910.  AIG has not shown that Huntington committed any intentionally malicious act—its acceptance of loan repayments, even while lacking a legitimate belief that Teleservices's transfers to Cyberco's account were merely Cyberco's receivables, was a step or two removed from any intentionally malicious act.  Huntington's lack of statutory good faith does not rise to the type of intentionally injurious conduct in *Level 3*.

On appeal, AIG cites several authorities in support of its argument that there is a "well-established principle in insurance law that when an insured returns property that it was never legally entitled to acquire, the insured has not sustained a 'loss' within the meaning of an insurance policy." But AIG fails to cite a single case addressing Ohio law, rendering its authorities inapplicable in addressing uninsurability in the state.

Despite the lack of on-point authority, AIG attempts to tie *Level 3* to Ohio law with two related arguments. It argues first that insurance exists to indemnify the insured for a loss, not provide a windfall, and second, it is a prerequisite to recovery that the insured have an insurable interest in the relevant property—if the insured does not, the "loss" of property to which it was never legally entitled would be an impermissible windfall. CA6 R. 25, Appellee Br., at 24–25 (citing *Roberts v. State Farm Mut. Auto. Ins. Co.*, 802 N.E.2d 157, 160 (Ohio Ct. App. 2003); *Fireman's Fund Ins. Co. v. Mitchell-Peterson, Inc.*, 578 N.E.2d 851, 859–60 (Ohio Ct. App. 1989); *Kungle v. Equitable Gen. Ins. Co.*, 500 N.E.2d 343, 348 (Ohio 1985)).

First, there is no "windfall" or double compensation to Huntington, the result avoided in both *Roberts* and *Mitchell-Peterson*. Huntington extended Cyberco a loan, and Huntington received repayment of that loan. Huntington incurred a loss when it settled the fraudulent transfer proceeding. If that loss were insurable, Huntington would not receive a "windfall" or be doubly compensated for its loss in the bankruptcy proceeding. Second, Huntington had a legal interest in the property, because it had a contractual right to receive repayment of the loan. And Huntington had a "legal right[]" to put the deposited funds—both the loan repayments and the excess deposits—to use, by gaining interest income from the deposited funds. *See Meoli*, 848 F.3d at 726 (quoting *Menotte v. U.S. (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1350 (11th Cir. 2014)). Receiving coverage for its loss would not constitute a windfall to Huntington.

AIG next argues that *Chubb Custom Insurance Co. v. Grange Mutual Casualty Co.*, No. 2:07-cv-1285, 2011 WL 4543896 (S.D. Ohio Sept. 29, 2011), supports its position. CA6 R. 25, Appellee Br., at 25–26 (quoting *Chubb*, 2011 WL 4543896, at \*11). *Chubb* considered whether the settlement of class action claims, which alleged an improper use of software by an insurance company that resulted in systematically underpaying insured persons for their claims, was "uninsurable under the law" of Ohio. *Chubb*, 2011 WL 4543896, at \*1, 4, 10–11. In evaluating what was uninsurable under Ohio law, *Chubb* considered *Level 3* and another out-of-circuit case, *Unified Western Grocers, Inc. v. Twin City Fire Insurance Co.*, 457 F.3d 1106 (9th Cir. 2006), yet failed to cite to any Ohio law on the question of insurability. *Chubb* thus cannot instruct us on what is uninsurable under Ohio law. The distinction that *Chubb* drew between "wrongfully acquired" and "simply retained" funds—the first being uninsurable and the latter being insurable— has no basis in Ohio law. *See Chubb*, 2011 WL 4543896, at \*11.

AIG similarly relies on *William Beaumont Hospital v. Federal Insurance Company*, 552 F. App'x 494 (6th Cir. 2014), as embracing *Chubb*'s distinction between "unlawfully retained" and "wrongfully acquired." *Id.* at 498. But *William Beaumont* is consistent with our holding that Huntington's claim is insurable under Ohio law. The at-issue policy in *William Beaumont* expressly excluded claims for disgorgement, unlike the policy here. 552 F. App'x at 499–500. The case was thus principally concerned with the interpretation and application of the term disgorgement, not Michigan public policy. *See id.* Further, *William Beaumont*'s discussion of Michigan public policy is consistent with the above analysis of Ohio public policy. *See id.* at 501 ("As the district court noted, [the insurer] has not identified any cases in the Sixth Circuit holding that disgorgement is not insurable. It still has yet to do so, relying only on cases not on point because they deal with intentional tortious or criminal acts.").

Finally, AIG asserts that *In re TransTexas Gas Corp.*, 597 F.3d 298 (5th Cir. 2010), is squarely on point. In *TransTexas*, the trustee of bankrupt TransTexas filed an adversary proceeding against its former CEO seeking to avoid a $3 million severance payment that the CEO received. *Id.* at 302–03. The insurer, National Union, sought a declaratory judgment that it was not liable under the policy for the judgment entered against the CEO. *Id.* at 303. The issue was whether the bankruptcy court's judgment against the CEO constituted a "Loss" under the policy, where "Loss" excluded matters "uninsurable under the law." *Id.* at 303, 309.

*TransTexas* held that the bankruptcy court judgment was uninsurable under Texas law. But the Fifth Circuit reached this conclusion because of a Texas case, *Nortex Oil & Gas Corp. v. Harbor Insurance Co.*, 456 S.W.2d 489 (Ct. Civ. App. Tx. 1970), which had held that an insurer "did not contract to indemnify the insured for disgorging that to which it was not entitled in the first place, or for being deprived of profits to which it was not entitled." *TransTexas*, 597 F.3d at 310 (quoting *Nortex*, 456 S.W.2d at 494). *TransTexas* also relied on *Level 3*. *Id.* With this foundation, *TransTexas* held that the return of funds due to a fraudulent transfer is "a disgorgement of ill-gotten gains and a restitutionary payment," and therefore uninsurable. *Id.*

There are many pertinent differences between *TransTexas* and this case, most importantly that *TransTexas* concerned transfers from a debtor *to an insider* under 11 U.S.C. § 548(a)(1)(B)(ii)(IV). Additionally, in *TransTexas*, the CEO was clearly not entitled to the $3 million. *See TransTexas*, 597 F.3d at 310 (acknowledging that the CEO "*may* have been entitled to something less," but not the full $3 million). Here, the money that Huntington was attempting to reobtain from Cyberco was not an attempt to steal—it was an attempt to obtain its own money that Huntington extended in the first place. The baseline facts are thus distinguishable from *TransTexas*. Finally, Ohio does not have the same case law as Texas. Ohio's case law is extremely

restrictive in terms of what it will find uninsurable under the law, refusing to make policy and abrogate the role of the legislature. "Although we might wish to balance the competing policy concerns . . . we believe that the clear policy of Ohio prohibits such a practice." *Casey*, 531 N.E.2d at 1350. Based on preexisting Ohio case law delineating precise categories of uninsurable losses, as well as an aversion to balancing competing policy interests and legislating from the bench, the Ohio Supreme Court would likely refuse to extend *Level 3* and *TransTexas* to Huntington's claim.

B.

The next question we address is whether the policy exclusion for claims based on "unrepaid, unrecoverable, or outstanding credit" applies to Huntington's claim. We conclude that it does not.

Endorsement 7 establishes exclusions specific to Huntington's performance of "Lending Acts." *See* DE 70-6, Ins. Pol., Page ID 2838. Lending Acts are "any act[s] performed by an Insured for: (i) a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit." *Id.* at 2837. The relevant exclusion to the performance of Lending Acts here is: "The Insurer shall not be liable to make any payment for Loss in connection with any Claim or Claims made against any Insured: for the principal and/or interest of any **unrepaid, unrecoverable, or outstanding credit**." *Id.* at 2838 (emphasis added). The parties do not dispute that Huntington was engaged in a Lending Act when it lent money to Cyberco, and thus that Endorsement 7 applies. The parties instead dispute the interpretation of the phrase "unrepaid, unrecoverable, or outstanding credit" in the exclusions.

Huntington makes a plain language argument. Huntington asserts that, by its express terms, the exclusion only applies to "unrepaid," "unrecoverable," or "outstanding" credit, none of which existed here. Huntington relies on the dictionary definitions of these three words:

"unrepaid" means "not repaid," Merriam-Webster Online, https://www.merriam-webster.com/dictionary/unrepaid (last accessed Oct. 4, 2023), "unrecoverable" means "unable to be recovered, recaptured, or regained" or "hopelessly lost," Merriam-Webster Online, https://www.merriam-webster.com/dictionary/unrecoverable (last accessed Oct. 4, 2023), and "outstanding," in the context of outstanding credit, means "unpaid," Merriam-Webster Online, https://www.merriam-webster.com/dictionary/outstanding (last accessed Oct. 4, 2023). *See Fed. Ins. Co. v. Exec. Coach Luxury Travel, Inc.*, 944 N.E.2d 215, 218–19 (Ohio 2010) (using dictionary definitions to define words in an insurance contract that have "common and ordinary definitions"); *Gomolka*, 436 N.E.2d at 1348 (noting that words and phrases used in an insurance policy must be given their natural and commonly accepted meaning where they in fact possess such meaning). Because Huntington extended a credit line to Cyberco, and because Cyberco fully repaid the credit line, there was no remaining credit that was "unpaid," "unable to be recovered, recaptured, or regained," or "hopelessly lost." Huntington's claim to AIG is thus not for credit that was unrepaid, unrecoverable, or outstanding, but rather for a settlement based on wrongful acts as understood within the policy, which is a "Loss." *See* DE 70-6, Ins. Pol., Page ID 2814.

AIG and the district court, on the other hand, make a form-over-substance argument for exclusion. The district court found that "Huntington's subsequent insurance claim was, in reality, an attempt to reobtain the loan payments it was forced to return." DE 84, Op. & Order, Page ID 5765. AIG adds that the "fundamental premise—and ultimate holding—of the underlying Adversary Proceeding was that the loan payments to Huntington were fraudulent transfers that Huntington was never legally entitled to receive or retain." CA6 R. 25, Appellee Br., at 47. Huntington thus ignores that its insurance claim is based on the Sixth Circuit's order to unwind those fraudulent payments after April 30, 2004, to return all parties to the status quo ante.

Essentially, because the bankruptcy proceeding unwound some of the loan repayments, the debt is "unrecoverable" or "outstanding." Huntington responds that had the Cyberco credit line truly been "unrepaid, unrecoverable, or outstanding," there would have been no basis for the trustee's fraudulent transfer proceedings against Huntington.

Both readings of the contract are reasonable interpretations. This case bears similarity to the insurance policy in *Andersen*, where "nonspecific and generic words or phrases" could be construed "in a variety of ways." *Andersen*, 757 N.E.2d at 332. *Andersen* noted that it was not the responsibility of the insured to guess whether these nonspecific and generic words would be construed against it. *See id.* AIG attempts to construe the nonspecific and generic terms "unrepaid, unrecoverable, or outstanding" to fit its specific meaning. This is not to say that AIG's interpretation is unreasonable, but rather that it is one of multiple reasonable interpretations of the text.

The ambiguity must be strictly construed against AIG as required under Ohio law. It is "well-settled" in Ohio law that, "where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King*, 519 N.E.2d at 1383. Insofar as the parties have offered their own separate interpretations of the policy language, both of them plausible, the court must "resolve any uncertainty in favor of the insured." *Neal-Pettit*, 928 N.E.2d at 424. We find that, because the Endorsement 7 language is ambiguous and open to more than one reasonable interpretation, that ambiguity should be resolved in favor of Huntington. This comports with the policy evident in Ohio case law that ambiguities should favor the insured and provide coverage. *Id.*; *King*, 519 N.E.2d at 1383; *Sharonville*, 846 N.E. 2d at 836; *Motorists*, 912 N.E. at 663.

Because the application of *contra proferentem* in this context conclusively resolves the interpretation of "unrepaid, unrecoverable, or outstanding credit," we need not consider extrinsic evidence. *See, e.g.*, *Grange Indem. Ins. Co. v. Hinds*, --- N.E.3d ---, 2023 WL 7486706, at *3 (Ohio Ct. App. Nov. 13, 2023) (extrinsic evidence only comes into play once ambiguities have been construed against the insurer); *Andersen*, 757 N.E.2d at 334.

## IV.

For the reasons discussed above, we reverse the district court's grant of summary judgment for AIG on the insurability of Huntington's claim under Ohio law and the exclusion of Huntington's claim under Endorsement 7. We remand for consideration of any remaining claims consistent with this holding.